# DISTRICT COURT OF THE VIRGIN ISLANDS
# DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal Action No. 2016-0025 |
| ) | |
| KAREEM MATTHIAS, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**Attorneys:**
**Alphonso G. Andrews, Jr., Esq.,**
St. Croix, U.S.V.I.
    *For the Government*

**Omodare B. Jupiter, Esq.,**
**Brendan A. Hurson, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant*

## MEMORANDUM OPINION

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant's "Motion to Suppress" (Dkt. No. 27)—wherein Defendant seeks to suppress any "photo array, identification procedure, and testimony pertaining to the identification of Mr. Matthias"—and the Government's Opposition thereto (Dkt. No. 33). For the following reasons, Defendant's Motion will be denied.

### I.    FACTUAL BACKGROUND[1]

On November 4, 2016, Defendant Kareem Matthias ("Defendant" or "Matthias") was

---

[1] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant Matthias is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

charged by Information with seven criminal counts: (1) felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); (2) using a firearm during a violent crime, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); (3) three counts of attempted murder first degree, in violation of 14 V.I.C. §§ 922(a)(1), 331(1) and 11; (4) reckless endangerment first degree, in violation of 14 V.I.C. § 625(a); and (5) unauthorized possession of a firearm, in violation of 14 V.I.C. § 2253(a).

On April 3, 2017, the Court held a suppression hearing in this matter. Virgin Islands Police Department ("VIPD") Detectives Kai Joseph and Danisha Samuel testified at the hearing and both the Government and Defendant entered several exhibits. At the conclusion of the hearing, the Court ordered the parties to submit supplemental briefing. Pursuant to the Court's Order, Defendant filed his "Supplemental Post-Hearing Memorandum in Support of Motion to Suppress Identification" on April 7, 2017 (Dkt. No. 52), and the Government filed its Response on April 27, 2017 (Dkt. No. 63). The following summary is based on the record established at the suppression hearing.

The charges stem from an incident that occurred at approximately 7:39 p.m. on April 12, 2016, near Grove Place Ball Park on St. Croix. Detective Joseph testified that he arrived on the scene to find a blue Chevy Blazer stopped next to the baseball field, and recognized damage to the body of the vehicle and windshield as bullet holes. He further testified that the area was well lit: there are streetlights and the adjacent basketball and tennis courts were illuminated. The Blazer was unattended when officers arrived at the scene. Kevon Benjamin-Edwards, the driver of the vehicle, came down the hill and approached patrol officers Jules and Buckley at the scene less than ten minutes after the officers arrived.

Detective Joseph testified that he spoke to Mr. Benjamin-Edwards at the scene of the shooting, who recounted the following sequence of events. Mr. Benjamin-Edwards was driving a blue Chevy Blazer in which another male (Mr. Jerimiah George), Mr. Benjamin-Edwards' sister

2

(Ms. Vanessa Adams), and two minor children were passengers. A white Acura (which had stock rims, a black spoiler, and a yellow "4 Sale" sticker in the rear window) pulled out in front of the Blazer such that the passenger side was facing toward the front of the Blazer. The Acura positioned itself so as to force the Blazer to slow down. A black male leaned out of the passenger side window of the Acura and discharged a number of shots toward the Blazer. Once shots were fired, Mr. Benjamin-Edwards exited from the vehicle and ran from the scene. Mr. Benjamin-Edwards stated that he knew the shooter as "Stinky," who he described as being in his twenties, six feet tall, black, and having shoulder length locks with a head covering.

Detective Samuel testified that she knew the name "Stinky" from a case she had worked on about a month earlier, in which Defendant Matthias had been the victim of a shooting. Detective Joseph testified that he instructed another officer to compile a photo array including Defendant's photo. According to Detective Joseph, the VIPD uses a database of arrest photos to create photo arrays. Because VIPD requires suspects to remove any head coverings before taking arrest photos, there were no photos of men with head coverings available to be used in the photo array.

A photo array was compiled using a 2010 photo of Defendant. According to Detective Samuel there was a more recent photo of Defendant, which she did not have available at the time. She testified that she would not have used the more recent photo in the array in any event because it was not appropriate for that purpose. The more recent photo was taken in a hospital room following an incident in which Defendant had been shot.

As the photo array reveals, at the time of his 2010 photo, Defendant did not have locks. (Government Ex. 31). Photos of five other men with comparable features also appear in the array. Defendant is depicted in a white shirt; two other individuals are in dark shirts; one individual is in a dark shirt that reveals a white shirt underneath; one individual is in a red/orange colored shirt; and the final individual—whose shirt color is less visible—appears to be in a salmon colored shirt.

(*Id.*).

According to the testimony of Detective Samuel, all three adults who were in the Blazer during the shooting went to the police station, where they were placed in separate rooms. Detective Joseph testified that Mr. Benjamin-Edwards was interviewed off camera, and then on camera from 9:16 p.m. to 9:25 p.m. Detective Joseph requested that the photo array be generated after the unrecorded portion of Mr. Benjamin-Edwards' interview. Following his recorded statement, Mr. Benjamin-Edwards was given a form explaining the procedure for the photo array, which, according to Detective Joseph, was read to Defendant. (Government Ex. 30). Detective Joseph testified that he then presented Mr. Benjamin-Edwards with the photo array. Detectives Joseph and Samuel were both present, and neither said anything to Mr. Benjamin-Edwards other than what was read to him from the form during the presentation of the photo array.[2]

Detectives Joseph and Samuel both testified that Mr. Benjamin-Edwards appeared "very confident" in his selection and selected Defendant's photo within seconds. They also testified that Mr. Benjamin-Edwards wrote his name next to Defendant's photo, and circled the corresponding number, which was three (3). Detective Joseph further testified that, on the photo array form, Mr. Benjamin-Edwards wrote, "I buy weed from he." (Government Ex. 30). However, because Mr. Benjamin-Edwards was not good at reading and writing, Detective Joseph wrote the following additional information on the form on behalf of Mr. Benjamin-Edwards: "The person in #3 is

---

[2] The instructions on the form are as follows:

> You are about to be shown a group of individuals who may or may not have been involved in a Criminal Act under Investigation. Please look carefully at each person. If you can identify the person who committed the Criminal Act, please circle the appropriate number below to indicate the person you have identified. Do not feel obligated to choose any particular photograph unless you are certain about your identification.

(Government Ex. 30).

stinky. He was the one that buss shot after me tonight."[3] Mr. Benjamin-Edwards did not offer, nor was he asked for, the degree of certainty with which he made his choice. According to Detective Joseph, the other witnesses were not presented with the photo array because they indicated that they did not see the shooter.

## II. DISCUSSION

In his Motion to Suppress, Defendant argues that the identification of Defendant by Mr. Benjamin-Edwards was improper because police suggested to him that "Stinky" had been the shooter; Mr. Benjamin-Edwards never demonstrated that he could observe the shooter; and Mr. Benjamin-Edwards was asked to identify "Stinky"—rather than the shooter—from the photo array presented to him by the police. (Dkt. No. 27). He also challenges the identification by arguing that none of the other occupants of the vehicle indicated that they were able to see the shooter. (Dkt. No. 52 at 5). In further support of his argument that the identification procedure was impermissibly suggestive, Defendant relies heavily on the Department of Justice's (DOJ) 1999 "Eyewitness Evidence: A Guide for Law Enforcement" ("DOJ Manual"), and former Deputy Attorney General Sally Yates' January 6, 2017 Memorandum ("Yates Memo"), with the accompanying DOJ "Eyewitness Identification Procedures for Conducting Photo Arrays." (Dkt. Nos. 52, 52-4, 52-5). He also asserts that the failure to follow the DOJ-sanctioned procedures renders the identification procedure impermissibly suggestive *per se*. (Dkt. No. 52 at 17-19).

In its Opposition, the Government argues that no unnecessarily suggestive procedures were used, and therefore there was no substantial likelihood of misidentification. (Dkt. No. 33 at 4). In

---

[3] Based on her recollection, Detective Samuel testified that Detective Joseph wrote all three sentences. However, based on the Court's review of the exhibit, it appears—seemingly consistent with Detective Joseph's testimony—that the first sentence is in a different handwriting than the second and third sentences, with the latter two sentences appearing to be in the same handwriting. (Government Ex. 30). In any event, this minor inconsistency in the testimony of the Detectives has not bearing on the Court's decision.

support of its position, the Government argues that Mr. Benjamin-Edwards: (1) knew Defendant from past encounters; (2) had adequate opportunity to observe him just prior to and at the time of the shooting; (3) gave an accurate physical description of Defendant and the vehicle he occupied; (4) identified Defendant by his "street name"; and (5) made the identification within two hours of the commission of the crime. (*Id.*). The Government further contends that failure to follow the DOJ procedures does not render the photo array impermissibly suggestive; the VIPD followed many of the suggested procedures; and the totality of the circumstances do not render the array impermissibly suggestive. (Dkt. No. 63).

### A. Applicable Legal Standards

An identification procedure that is both "(1) unnecessarily suggestive and (2) creates a substantial risk of misidentification" violates a defendant's Fifth Amendment right to due process. *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006) (citing *Manson v. Brathwaite*, 432 U.S. 98, 107-08 (1977)). "Unnecessary suggestiveness 'contains two component parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures.'" *Id.* (quoting *United States v. Stevens*, 935 F.2d 1380, 1389 (3d Cir. 1991)). "An impermissibly suggestive identification procedure can occur in four settings: a show-up, a photo array, a line-up and in court." *Id.* (citing *Identifications*, 34 Geo. L.J. Ann. Rev. Crim. Proc. 149, 153 n.496 (2005)). The identification procedure at issue here is a photo array.

The use of a photo array may violate due process "when police attempt to emphasize the photograph of a given suspect, or when circumstances surrounding the array unduly suggest who an identifying witness should select." *United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003) (citing *Simmons v. United States*, 390 U.S. 377, 383 (1968)); *see also United States v. Ladson*, 238 F. App'x 874, 877 (3d Cir. 2007). However, "[a] photographic array is not unnecessarily

6

suggestive solely because certain characteristics of a defendant or photograph set him apart from the other persons pictured in the array." *United States v. Burnett*, 773 F.3d 122, 133 (3d Cir. 2014) (citing *Reese v. Fulcomer*, 946 F.2d 247, 260 (3d Cir. 1991)). "The key question is whether differences in characteristics 'sufficiently distinguish' a defendant to suggest culpability." *Id.* (citing *Reese*, 946 F.2d at 260).

"In evaluating the suggestiveness of a photographic array, [the court must] examine the totality of the circumstances to determine whether the array's suggestiveness denied the defendant due process." *Lawrence*, 349 F.3d at 115 (citing *Brownlee*, 454 F.3d at 139)). Specifically, the court considers "several factors, including the size of the array, its manner of presentation, and its contents." *Reese*, 946 F.2d at 260. Defendant bears the burden of proving that the photo array was unnecessarily suggestive. *Lawrence*, 349 F.3d at 115; *see also United States v. Clausen*, 328 F.3d 708, 713 (3d Cir. 2003).

An unnecessarily suggestive photo array alone "does not in itself require exclusion of the evidence." *Reese*, 946 F.2d at 259 (quoting *United States v. Dowling*, 855 F.2d 114, 117 (3d Cir. 1988), *aff'd*, 493 U.S. 342 (1990) (internal quotation marks omitted)). "A court should suppress an identification only where 'the photographic identification procedure was so suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Burnett*, 773 F.3d at 133 (quoting *Simmons*, 390 U.S. at 384 (alteration in *Burnett*)). "[R]eliability is the linchpin in determining the admissibility of identification testimony . . ." *Stevens*, 935 F.2d at 1391 (quoting *Brathwaite*, 432 U.S. at 114) (internal quotation marks omitted).

To determine whether an identification was reliable despite an impermissibly suggestive procedure, the court must consider the totality of the circumstances, including:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the

confrontation; and (5) the length of time between the crime and the confrontation. *Brownlee*, 454 F.3d at 139 (citing *Neil v. Biggers*, 409 U.S. 188, 198-99 (1972)). These factors are to be weighed against "the corrupting effect of the suggestive identification itself." *Manson*, 432 U.S. at 114. The Supreme Court has noted that "courts should not reach the reliability inquiry unless the identification resulted from a situation created by improper police conduct." *United States v. Shavers*, 693 F.3d 363, 382 (3d Cir. 2012) (citing *Perry v. New Hampshire*, 132 S. Ct. 716, 728 (2012)); *see also United States v. Roland*, 545 F. App'x 108, 114 (3d Cir. 2013) (citing *Stevens*, 935 F.2d at 1389) (stating that the court need only engage in the "totality of the circumstances" analysis if the identification procedure was unnecessarily or impermissibly suggestive); *United States v. Smith*, 505 F. App'x 149, 152 (3d Cir. 2012) ("Only if a procedure was too suggestive need a court ask whether it should nonetheless be admitted as reliable under the totality of the circumstances." (citing *Biggers*, 409 U.S. at 199)).

In sum, the Court must engage in a two-step inquiry to determine "(1) whether the identification process was unduly suggestive and, if so, (2) whether the totality of the circumstances nonetheless renders the identification reliable." *Thomas v. Varner*, 428 F.3d 491, 503 (3d Cir. 2005). If the identification procedure was not unduly suggestive, then the Court need not engage in the totality of the circumstances analysis. *Smith*, 505 F. App'x at 152.

**B. Analysis**

Defendant's inclusion in the photo array was the result of Mr. Benjamin-Edwards' identification of his shooter as "Stinky"—Defendant's street name. All of the photographs in the array are of equal size, and the men depicted therein have similar skin tones, features, and hairstyles. (Government Ex. 31). Except for being the only individual wearing a white shirt, Defendant was unable to point to any characteristic of Defendant's photo that allegedly set him apart from the other individuals pictured. However, Defendant's white shirt is of no real

significance here because the individuals shown in the photo array are wearing shirts of various colors—dark-colored shirts, a dark colored shirt with a white undershirt, a red/orange shirt, and what appears to be a salmon colored shirt. Thus, Defendant's white shirt does not distinguish Matthias from the other individuals pictured any more, for example, than the red/orange shirt or the dark shirt with the white undershirt distinguishes those individuals. *United States v. Dowling*, 855 F.2d 114, 117 (3d Cir. 1988) (six-person photographic array was not unduly suggestive when the defendant was the only one wearing a red shirt because all individuals "were reasonably comparable in dress and appearance"). Defendant's white shirt does not, therefore, "sufficiently distinguish" Defendant from the other individuals so as to suggest culpability. *Burnett*, 773 F.3d at 133. Nor is there anything else about Defendant's photo that would "sufficiently distinguish" him from the other photographs such that the array suggests culpability. *Id.*

Defendant notes that a more recent photo of Defendant was available. However, failure to use the most current photo, standing alone, does not render the array suggestive. *Gallimore v. Feliciano*, 2015 WL 3856694, at *6 (S.D.N.Y. June 19, 2015) (citing *People v. Griffin,* 973 N.Y.S.2d 5, 5 (App. Div. 2013); *Braggs v. Clark*, 2011 WL 1641980, at *10 (C.D. Cal. Mar. 3, 2011), *report and recommendation adopted*, 2011 WL 1641975 (C.D. Cal. Apr. 30, 2011) ("The Court is not aware of any authority requiring the use of a recent photograph in a line-up, and Petitioner has not cited to any."). Detective Samuel testified that she did not have the more current photo available at the time the array was assembled, and further, that it was not an appropriate photo for use in an array. The Court has reviewed the photo admitted as Government's Exhibit 32 and concurs that the picture of Defendant in a hospital bed, with bloodshot eyes and lighting that obscures his features, is not a good candidate for inclusion in a photo array. In any event, the use of an older photo of Defendant (here, a six-year old photo), standing alone, does not render the photo array impermissibly suggestive.

Further, there was no testimony suggesting that the detectives administering the array engaged in any behavior that would taint Mr. Benjamin-Edwards' identification of Defendant. The array was accompanied by instructions that were not suggestive, and clearly indicated that the witness need not select a photograph from the array. *See supra* footnote 3. Testimony established that no other communications were made by the detectives at the time the array was presented. Contrary to Defendant's contention, the detectives testified that they asked Mr. Benjamin-Edwards to identify "the person who committed the Criminal Act"—not "Stinky"—from the array. (Government Ex. 30). The detectives testified that Mr. Benjamin-Edwards selected Defendant's photo from the array within seconds, and further observed that he was "very confident in his selection." This identification came notwithstanding that the photo was several years old and depicted Defendant with short hair, rather than the locks Mr. Benjamin-Edwards stated that Defendant had at the time of the shooting.[4]

Defendant argues that the VIPD's failure to follow all of the "best practices" set forth in the Department of Justice's "Eyewitness Identification Procedures for Conducting Photo Arrays" renders the array impermissibly suggestive *per se*. (Dkt. No. 52 at 17). In fact, Defendant goes so far as to argue that "the court could take judicial notice of these procedures," and require them in every case. (*Id.* at 4). However, as pointed out by the Government, the Yates Memo contains a clear caveat: "nothing in this memorandum implies that an identification not done in accordance with these procedures is unreliable or inadmissible in court." (Dkt. No. 52-5 at 2). In addition, the Procedures themselves bear a cautionary note regarding their use:

> This document is not intended to create, does not create, and my not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in

---

[4] Contrary to Defendant's contention (Dkt. No. 52 at 20-21 and 21 n.6), the fact that Mr. Benjamin-Edwards was able to identify Defendant from a six-year old photo in which Defendant's hairstyle was completely different bolsters, rather than impugns, the credibility of Mr. Benjamin-Edwards' familiarity with defendant.

any matter civil or criminal. Nothing in these procedures implies that an identification not done in accordance with these procedures is unreliable or inadmissible in court.

(*Id.* at 3). The 1999 Eyewitness Evidence Guide similarly disclaims that it "is not intended to state legal criteria for the admissibility of evidence." (Dkt. No. 52-4 at 14).

In support of his "best practices" argument, Defendant points to the Massachusetts Supreme Court's decision in *Commonwealth v. Thomas*, 476 Mass. 451 (2017), and discusses at length then-Chief Judge Theodore McKee's concurrence in *Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 313 (3d Cir. 2016) (en banc), which includes references to developments in the state courts of Oregon and New Jersey. (Dkt. No. 52 at 6-8, 14-19). The majority in *Dennis* granted post-conviction relief based on *Brady* violations, without opining on the standards for suppressing eyewitness identifications. 834 F.3d at 263-313. The concurrence authored by Judge McKee, which was joined by Judge Thomas Ambro, "underscore[s] the problems inherent in eyewitness testimony and the inadequacies of our standard jury instructions relating to that evidence." *Id.* at 313. In so doing, Judge McKee reviewed the scientific evidence on eyewitness testimony, opined that "the law has not caught up to the science," and concluded that "robust jury instructions can minimize the dangers associated with inaccurate eyewitness identifications." *Id.* at 313-44.

While it is clear that there are ongoing discussions regarding practices designed to help evaluate the accuracy and reliability of eyewitness identifications—including in the Third Circuit, where a Task Force on Eyewitness Identifications was formed in 2016—the controlling law in the Third Circuit regarding the analysis of identification procedures remains unchanged. Thus, although the procedures followed by the VIPD did not incorporate all of "the accepted practices summarized by [then] Chief Judge McKee and recommended by the DOJ," (Dkt. No. 52 at 17), they were legally sufficient under the governing law and based on the record before the Court.

In sum, the Court declines Defendant's invitation to adopt a rule that failure to follow "industry protocol, standing alone" necessarily amounts to an unduly suggestive procedure that would result in "a very substantial likelihood of [irreparable] misidentification." (*See* Dkt. No. 52 at 19).[5] Defendants are entitled to an identification procedure that is not *unduly suggestive*—not a perfect identification procedure. *Thomas*, 428 F.3d at 503. The Court concludes that Defendant has not met his burden to demonstrate that the identification process was unduly suggestive. *Lawrence*, 349 F.3d at 115.

Because the Court concludes that the array and its presentation were not unduly suggestive or the result of improper police conduct, it need not reach the reliability inquiry. *Shavers*, 693 F.3d at 382; *Smith*, 505 F. App'x at 152. However, even if the Court were to address this latter issue, the totality of the circumstances would nonetheless render the identification reliable. *See Thomas*, 428 F.3d at 503. Mr. Benjamin-Edwards appears from the record to have had a reasonable opportunity to view the shooter. According to the testimony, the vehicle with the shooter pulled out in front of Mr. Benjamin-Edwards' Blazer with the passenger side facing the front of the Blazer, and the shooter leaned out of the window on the passenger of the vehicle side and discharged the firearm. Further, Mr. Benjamin-Edwards knew Defendant from having previously purchased marijuana from him;[6] gave an accurate physical description of Defendant; identified

---

[5] Defendant apparently recognizes that the position he advocates is not the governing law, given his reliance on his interpretation of the Massachusetts state court ruling in *Thomas* and the "observations" made in *Dennis* for his conclusion. (Dkt. No. 52 at 19).

[6] That Ms. Adams may know more details about Defendant (having gone to school with him) than Mr. Benjamin-Edwards, who apparently knew him from the street selling "weed," does not render inadmissible Mr. Benjamin-Edwards identification of Defendant, nor do Ms. Adams' statements that she observed two shooters in the Acura, did not see either shooter, and did not see "Stinky" on the night of the shooting. (Dkt. No. 52 at 22-23). Defendant is free to highlight discrepancies in the recollections of witnesses, degree of familiarity, and the like—which go to the weight rather than the admissibility of Mr. Benjamin-Edwards' identification—at trial. (*See id.* at 20-23).

him by his street name prior to viewing the photo array; selected Defendant within seconds of being presented with the photo array and appeared "very confident in his selection"; and made his identification within two hours of the shooting. *See Brownlee*, 454 F.3d at 139. Based on these facts, the Court concludes that the totality of the circumstances "renders the identification reliable." *Thomas*, 428 F.3d at 503.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that the photo array and its presentation were not unduly suggestive. Further, even if the reliability inquiry had to be reached, the totality of the circumstances renders the identification reliable. Accordingly, Defendant's Motion to Suppress will be denied. An appropriate Order accompanies this Memorandum Opinion.

Date: June 5, 2017 _____/s/_____
WILMA A. LEWIS
Chief Judge